UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SCORPIO 8283 LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : No. 08 CV 510 (CLB) |
| -against- | : **FILED BY ECF** |
| | : |
| MYCA, LLC and 2220 EQUITIES MANAGEMENT | : |
| LIMITED PARTNERSHIP, | : |
| | : |
| Defendants. | : |
| | : |

## DECLARATION OF SARA MINSKOFF ALLAN
## IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION TO
## DISMISS THE COMPLAINT AND IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

SARA MINSKOFF ALLAN, being duly sworn, deposes and says:

1.      I am a member of MYCA, LLC, a Delaware limited liability company. MYCA is a partner in and owns a 17.6% partnership interest in Court-Martine Associates (the "Partnership"), the New York general partnership that plaintiff Scorpio 8283 LLC ("Scorpio") seeks to dissolve in the above-captioned litigation (the "Action"). The statements in this affidavit are based on my own personal knowledge. I am over the age of majority and competent to testify to the matters described herein.

2.      As discussed in my declaration in this Action dated February 28, 2008, Court-Martine Associates' primary asset is a 75% partnership interest in a second, non-party partnership known as 82nd-83rd Street Venture. 82nd-83rd Street Venture owns and operates commercial real estate located at 167–183 Martine Avenue and 39–55 Court Street in White Plains, New York (the "Property"). MYCA also is a partner in 82nd-83rd Street Venture, owning a 6.25% partnership interest.

1

**The Functioning Majority**

3.      2220 Equities Management Limited Partnership ("2220 Equities") also is a partner in the Partnership, and holds a 41.2% partnership interest. MYCA and 2220 Equities together are a majority of the Partnership. As discussed in my declaration in this Action dated February 28, 2008, and as Royanne Minskoff, a principal of 2220 Equities, explained in her declaration in this Action dated February 28, 2008, MYCA and 2220 Equities are in general agreement regarding the Partnership and the Property. Both MYCA and 2220 Equities believe the Property should be managed by an independent, third-party managing agent and not by Minskoff Grant Realty & Management Corp. ("MGRMC").

4.      I understand that Scorpio has asserted that deadlock exists in making Partnership decisions. At meetings held on November 30, 2007, in Court-Martine Associates and 82nd-83rd Street Venture, the partnerships decided, pursuant to majority vote, to change the property manager for the Property. As the transcript reflects, the partnerships also decided in February 2007 to change general outside counsel. A true and complete copy of a transcript of the November 30, 2007, meetings is attached hereto as Exhibit 1.

**Deficiencies In MGRMC's Management**

5.      For several years, Jean Minskoff Grant and her company, MGRMC, have exercised control over the management of properties owned by several Minskoff family real estate partnerships, including the Property owned by 82nd-83rd Street Venture. Grant is the Chief Operating Officer of MGRMC. Upon information and belief, Grant's husband Francis C. Grant III is the Chief Executive Officer of MGRMC. Upon information and belief, prior to her death, Grant's mother, Marjorie Minskoff Schleifer, was the owner of MGRMC and also owned

or controlled partnership interests now owned or controlled by her children and their spouses, Jean and Francis Grant, Alan and Royanne Minskoff, and James D. Sterling.

6.      MYCA has never executed any management agreement with MGRMC respecting the Property, 82nd-83rd Street Venture, Court-Martine Associates, or any other Minskoff family partnership in which MYCA is a partner. In fact, MYCA has expressly refused to enter into any management agreement with MGRMC.

7.      MGRMC consistently has failed to provide MYCA and, upon information and belief, other partners in this and other Minskoff family real estate partnerships with full access to partnership books and records. MGRMC also has not been responsive to MYCA's concerns and interests, and has blocked MYCA's opportunity to participate in decisions affecting this and other partnerships and properties.

8.      The following is not intended to be a full and complete recitation of each of MGRMC's deficiencies or MYCA's concerns with MGRMC. Rather, it is only a summary of some of those concerns and a small number of examples.

### *The Purported Management Agreements*

9.      In approximately 2001, MYCA asked Grant to provide MYCA with executed copies of MGRMC's purported management agreement regarding the Property and other partnership properties. Grant refused to do so unless MYCA agreed to sign the agreements. MYCA refused to give its consent to MGRMC's management of the Property and Grant, in turn, refused to provide MYCA with a copy of the purported agreements.

10.     At the time of the November 30, 2007, partnership meetings, MYCA still did not have copies of the purported management agreements. *See* Exhibit 1 (transcript at 18:5-10). Grant first provided MYCA with a copy of the executed purported management agreement in December 2007. This was after the Partnership had voted to terminate MGRMC as manager of

the Property, and only at the request of Grant's ally, Michael Breede. A true and correct copy of the purported management agreement with Court-Martine Associates dated January 1, 2002, provided in December 2007 is attached hereto as Exhibit 2.

11.     The document purports to be a management agreement among MGRMC and Court-Martine. The document relates, however, to management of the Property, which is owned by 82nd-83rd Street Venture. It apparently is executed by Patricia Breede and Marjorie Minskoff Schleifer, purportedly on behalf of Court-Martine, and by Grant on behalf of MGRMC. As noted above, upon information and belief, Marjorie Minskoff Schleifer was then the owner of MGRMC as well as a partner in Court-Martine.

### MGRMC's Failure To Provide Partnership Records

12.     Grant has also refused to provide MYCA with other information and/or documents relating to the Partnership, the Property, and other Minskoff family partnerships in which MYCA is a partner. A particularly egregious example occurred in May 2004. On May 13, 2004, MYCA, through its counsel, wrote a letter to Grant and MGRMC seeking access to partnership books and records (for example, leases, mortgages, invoices, receipts, bank account statements, check registers, journals, ledgers, tax returns, contracts, audits, and correspondence) relating to the Partnership and other Minskoff family partnerships in which MYCA is a partner. In her May 24, 2004, response, Grant refused to permit MYCA access to the requested records unless MYCA agreed to eight "Ground Rules." Among these ground rules, Grant demanded that a security guard be present for the inspection, at MYCA's expense. Grant also demanded that MYCA provide a $20,000 advance deposit. MYCA refused to limit its right to access the partnership books according to Grant's outlandish "Ground Rules." Grant, in turn, never dropped these so-called ground rules or allowed access to the requested materials, despite

follow-up requests. A true and correct copy of Grant's May 24, 2004, letter is attached hereto as Exhibit 3.

13.    Grant and MGRMC have also refused to provide MYCA with requested lease agreements, financing agreements and other important partnership records on other occasions. At times when MGRMC ultimately complied with MYCA's requests, it often was only after repeated requests and long delays. Other times, documents were provided only after they were executed or rejected purportedly on behalf of the partnerships, impeding MYCA's ability to participate in partnership decisions.

14.    On or about December 30, 2007, for example, a partner in 9th Street Associates, another partnership in which MYCA is a partner and whose property MGRMC manages, offered either to buy or to sell the other partners' interests. MYCA requested from MGRMC copies of partnership records necessary to value the property and fully evaluate the offer. MGRMC provided only a portion of the requested documents before the offer expired, provided tenant leases for the property after the offer expired, and still has failed to provide much of the documents and information required to accurately assess the value of the property or interests in the partnership.

### *Property Reports and Budgets*

15.    Although MGRMC provides monthly and quarterly reports on properties it manages, these reports often either contain language recycled from prior reports or simply refer the partners back to prior reports. In addition, the reports frequently are the vehicle by which MYCA first learns of actions MGRMC has already taken or agreements MGRMC has already entered into with regard to the properties, without advance notice or the opportunity to provide input.

16.     In other instances, Grant and MGRMC have refused to respond to MYCA's concerns or requests for additional information. For example, Grant and MGRMC have circulated budgets to the partners in the Partnership and other Minskoff family partnerships. Despite MYCA's requests, on various occasions Grant and MGRMC have refused to sufficiently explain budget items or the allotment of certain monies in MGRMC's annual budgets, often citing "past practice" or some other response without further detail or information.

### MGRMC Disregards Its Termination

17.     Although the Partnership directed MGRMC to turn management of the Property over to a new, independent manager by January 1, 2008, MGRMC has refused to acknowledge the Partnership's direction or MGRMC's termination. For the past several months, MGRMC has continued to seek to exercise control over the Partnership's books and records and the Property, including the Partnership's bank accounts and relationships with tenants of the Property.

18.     For example, upon information and belief, in the past month MGRMC, through Francis Grant, directed Josh Kimerling, Esq., of Cuddy & Feder LLP, to initiate an eviction proceeding against a tenant of the Property. This was done without giving notice to MYCA and without its approval, and despite directions from the Partnership that MGRMC should cease holding itself out as an agent of the Partnership. After learning of the eviction proceedings, MYCA sent correspondence through its counsel, Akin Gump Strauss Hauer & Feld LLP, to Mr. Kimerling specifically informing him that MGRMC's authority regarding the Property had been terminated. A true and correct copy of the correspondence sent on behalf of MYCA is attached as Exhibit 4 to the Affidavit Of Michael D. Lockard In Further Support Of Defendants' Joint Motion To Dismiss The Complaint And In Opposition to Plaintiff's Cross-Motion For Summary Judgment, dated April 17, 2008.

6

19.    As a result of the foregoing, MYCA continues to be dissatisfied with and disapproves of Grant's and MGRMC's management of the Property.  MYCA does not trust Grant or MGRMC to respect partnership decisions made by the majority.  MYCA also does not trust Grant and/or MGRMC to provide MYCA with sufficient information about the Property or access to partnership records.

20.    I declare under penalty of perjury that the foregoing is true and correct.


Executed:    April 17, 2008
             Palm Beach, Florida

_____
                    Sara Minskoff Allan

# EXHIBIT 1

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13      Management Change Meeting - 1
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

1  [BEEP]
2  MAN: Hello?
3  ROBB ALEY ALLAN?: All right. For the
4  record, this is a meeting of the partners of
5  82nd-83rd Street Venture. Uh, it is November
6  30th at 4:02 East Coast time. I would also add
7  that in addition, it is a meeting of Court-
8  Martine Associates, which is a subpartnership
9  with the same partners. And what I'm going to do
10  is call the roll for both of them separately just
11  for the record. So on behalf of Court-Martine
12  Associates and on behalf of 2220 Equities
13  Management LP, Royanne Minskoff –
14  ROYANNE MINSKOFF: Present.
15  ROBB ALEY ALLAN: Um, on behalf of MYCA
16  LLC, Sara Minskoff Allan –
17  SARA MINSKOFF ALLAN: Present.
18  ROBB ALEY ALLAN: And on behalf of
19  Scorpio 8283 LLC, Michael Breede –
20  MICHAEL BREEDE: Present.
21  ROBB ALEY ALLAN: All right. So the,
22  the quorum, in fact a unanimous quorum –
23  MICHAEL BREEDE: Oh, oh, there, there's
24  another one, too – Pisces.
25  ROBB ALEY ALLAN: I'm sorry?

TSG Reporting - Worldwide    877-702-9580

## Page 3

1  MICHAEL BREEDE: Pi, Pisces 82nd-83rd,
2  Michael Breede present.
3  ROBB ALEY ALLAN: Well, I haven't
4  gotten there yet, Michael [OVERLAPPING].
5  MICHAEL BREEDE: Oh, sorry.
6  ROBB ALEY ALLAN: Uh, we have a quorum
7  for, a, Court-Martine Associates and I think one
8  of the things we need to establish before we move
9  into the meeting on 82nd-83rd is who is going to
10  act as a representative of Court-Martine
11  Associates to vote on behalf of it at 82nd-83rd.
12  I think to make this easy, I would suggest to
13  nominate Royanne Minskoff to be the partner
14  representative for Court-Martine Associates to
15  82nd-83rd for the purpose of this vote. Anybody
16  want to second that?
17  MICHAEL BREEDE: Yeah, I'll second it,
18  that's fair enough.
19  ROBB ALEY ALLAN: Uh, any objection?
20  All right, Royanne, you're it. Now, on behalf of
21  82nd-83rd and on behalf of 2220 Equities – uh,
22  actually, I'm sorry, it's not 2220 Equities
23  according to my record. It is Alan and Royanne
24  Minskoff.
25  ROYANNE MINSKOFF: Correct.

TSG Reporting - Worldwide    877-702-9580

## Page 4

1  ROBB ALEY ALLAN: Royanne?
2  ROYANNE MINSKOFF: Present.
3  ROBB ALEY ALLAN: On behalf of Sara
4  Minskoff Allan, Sara?
5  SARA MINSKOFF ALLAN: Present.
6  ROBB ALEY ALLAN: On behalf of Patricia
7  and Michael Breede?
8  MICHAEL BREEDE: Uh, we don't have a
9  personal interest in this.
10  ROBB ALEY ALLAN: All right. My list,
11  then, is incorrect. So you're saying Pisces 82-
12  83 –
13  MICHAEL BREEDE: Well, see, I got, I
14  got a little confused there because I think I
15  might have seconded something under, uh, under
16  misunderstood circumstances. I thought I was
17  seconding for Pisces, not for Scorpio, because
18  Scorpio is a larger ownership.
19  ROBB ALEY ALLAN: Let me establish the
20  roll first and then I'll go back and remake the
21  motion.
22  MICHAEL BREEDE: Okay.
23  ROBB ALEY ALLAN: But on behalf of I
24  guess that's Pisces 82-83 –
25  MICHAEL BREEDE: Yes.

TSG Reporting - Worldwide    877-702-9580

## Page 5

1  ROBB ALEY ALLAN: -- which is the
2  owner, you're owner of record for 82nd-83rd [BEEP
3  NOISE] Michael?
4  MICHAEL BREEDE: Yes.
5  ROBB ALEY ALLAN: All right. Someone
6  just joined the call? Hello?
7  MAN: Hello?
8  ROBB ALEY ALLAN: I thought I heard a
9  beep. On behalf of Stacey Minskoff –
10  WOMAN: I did, too.
11  ROBB ALEY ALLAN: All right, I don't
12  think she's here.
13  MICHAEL BREEDE: No.
14  ROBB ALEY ALLAN: Royanne, are you
15  still there?
16  ROYANNE MINSKOFF: Yes.
17  ROBB ALEY ALLAN: All right. It
18  sounded to me like somebody dialed in and then
19  dropped out. All right. Michael, the motion was
20  with regard to the Court-Martine, who would speak
21  on behalf of Court-Martine in a vote at 82nd-
22  83rd. And so what I was proposing or moving –
23  MICHAEL BREEDE: But [OVERLAPPING]
24  right, I understand what you proposed, but
25  what's, which, which is Court-Martine and which

TSG Reporting - Worldwide    877-702-9580

Page 6

1   is 82nd-83rd. I'm confused right now. Pisces or
2   Scorpio?
3            ROBB ALEY ALLAN: Well, my record shows
4   that Scorpio is Court-Martine and you and Patrish
5   individually are 82nd-83rd. So I think that's
6   probably incorrect.
7            [OVERLAPPING VOICES]
8            MICHAEL BREEDE: Hold on. Let me get a
9   file out.
10           ROBB ALEY ALLAN: Half of any interest
11  that you own in Court-Martine [LAUGHTER] –
12           MICHAEL BREEDE: No, no, I understand
13  what you're saying but there's, there's an
14  important difference here and that is where my
15  percentage is larger, I want to retain my own
16  vote. Hang on. I'm looking at the year-ends
17  'cause they'll tell me. All right. Here we go –
18  82nd-83rd is Pisces. Okay, so for Court-Martine,
19  I've got 4120 so I don't, I, I, I'm not going to
20  second anything on that. Okay? Somebody else
21  can but I'm not.
22           ROBB ALEY ALLAN: Let's do that vote
23  from scratch [LAUGHTER]. Taking half of Court-
24  Martine Associates, I would move to nominate
25  Royanne Minskoff to speak on behalf of Court-

TSG Reporting - Worldwide     877-702-9580

Page 7

1   Martine Associates to the 82nd-83rd Street
2   Venture for the purposes of this meeting.
3            WOMAN: I will second that.
4            ROBB ALEY ALLAN: All right. No, you
5   can't second because I'm making your motion
6   [LAUGHTER]. Royanne, would you like to second
7   that?
8            ROYANNE MINSKOFF: I'll second it.
9            ROBB ALEY ALLAN: All right. That's
10  properly seconded, I will now call for a vote.
11  All in favor?
12           SARA MINSKOFF ALLAN: Aye.
13           ROBB ALEY ALLAN: Sara's an aye.
14           ROYANNE MINSKOFF: Aye.
15           ROBB ALEY ALLAN: Royanne's an aye.
16  Michael?
17           MICHAEL BREEDE: Nay.
18           ROBB ALEY ALLAN: You're a nay.
19  Nonetheless, Michael, you are outvoted –
20           MICHAEL BREEDE: I understand.
21           ROBB ALEY ALLAN: - because your
22  interest is 41 percent and the majority interest
23  carries.
24           MICHAEL BREEDE: Um, I understand.
25           ROBB ALEY ALLAN: So Royanne will speak

TSG Reporting - Worldwide     877-702-9580

Page 8

1   on behalf of Court-Martine -
2            MICHAEL BREEDE: Uh-huh.
3            ROBB ALEY ALLAN: - as we immediately
4   adjourn Court-Martine and reconvene 82nd-83rd.
5            MICHAEL BREEDE: But that is to speak
6   as opposed to vote.
7            ROBB ALEY ALLAN: No, I said to vote.
8   To represent.
9            MICHAEL BREEDE: Okay.
10           ROYANNE MINSKOFF?: Let me, let me ask
11  a question. Is there, is there any reason why we
12  can't just vote the total property or – I'm, I'm
13  confused.
14           ROBB ALEY ALLAN: I wouldn't do it that
15  way. I think, uh, you can have Court-Martine
16  speak in one of two ways at 82nd-83rd. You can
17  either have a designated representative or each
18  vote can be sub-voted on by the partners of 80,
19  uh, Court-Martine, which I think, you know, since
20  we only have one motion, maybe it's easiest to do
21  it that way, but –
22           ROYANNE MINSKOFF: Let's do it that
23  way.
24           ROBB ALEY ALLAN: -- but it's
25  cumbersome in any other form.

TSG Reporting - Worldwide     877-702-9580

Page 9

1            ROYANNE MINSKOFF: Yeah. Let's do it.
2   I'm, I'm comfortable with, um, letting everyone
3   vote their interest in Court-Martine and then
4   letting everyone vote their interest in 82nd-
5   83rd.
6            ROBB ALEY ALLAN: All right. So I take
7   that as a motion to rescind the motion just
8   passed. Sara, will you second it? Sara seconded
9   it. Anybody opposed? Nobody's opposed. Okay,
10  the previous motion's deleted and we're back to
11  Court-Martine representing itself by vote, uh, as
12  each motion is presented.
13           All right. Very much as we just
14  discussed the 77th Queens, the purpose of this
15  meeting was to review the status of current
16  management of legal services and for the record,
17  I'll simply reiterate briefly what I said about
18  legal services, which was that we had a call in
19  February, which empowered –
20           WOMAN: [INAUDIBLE]
21           ROBB ALEY ALLAN: I have to, I want it
22  on the record. Which empowered Royanne and
23  myself to represent the partnership with regard
24  to seeking an alternative to legal representation
25  for the partnership. As I mentioned at that

TSG Reporting - Worldwide     877-702-9580

Page 10

1  previously, [DEL BELLO?] was advanced and then
2  withdrawn and Thiel & Reed in the guise of David
3  [OLISOFF?] – should I say David [OLISOFF?] in the
4  guise of Thiel & Reed, was, uh, was approved and
5  has been retained.
6          The other issue on the agenda is a
7  discussion of current management and again, for
8  the record, we've received a management proposal
9  from Armstrong Realty Management Corp. for
10 management of this property, which has been
11 circulated electronically to all of the partners
12 and will be circulated in paper form over the
13 weekend or on Monday.  I believe everybody's
14 received that.  Uh, we've had some, uh, extensive
15 discussion by the very same parties who are
16 currently on this call during the 77th Queens
17 call and I think it would be unnecessary, unless
18 someone would like to do so, to rehash that very
19 same conversation and would direct any interested
20 parties to the 77th Street.
21         MICHAEL BREEDE?: Could I make a
22 motion?
23         ROBB ALEY ALLAN: By all means.
24         MICHAEL BREEDE?: I'd like to make a
25 motion to affirm the conclusions that we made

TSG Reporting - Worldwide    877-702-9580

Page 11

1  with respect to the first issue, which was
2  respect to legal representation for 77 Queens for
3  this partnership.
4          ROBB ALEY ALLAN: I don't know what
5  that means.
6          MICHAEL BREEDE?: I'm affirming, I'm,
7  I'm, I'm affirming the same thing, the same
8  conclusion in both that we came to with respect
9  to memorializing and everything, with respect to
10 77th for 82nd-83rd Court-Martine.
11         ROBB ALEY ALLAN: I don't think we had
12 any kind of vote on legal services current the
13 77th Street call.  It was just a –
14         MICHAEL BREEDE: We just confirmed it.
15         ROBB ALEY ALLAN: What's that?
16         MICHAEL BREEDE: We just confirmed it.
17         ROBB ALEY ALLAN: Con –
18         MICHAEL BREEDE: Confirmed who was
19 representing the partnership.
20         VOICES: Right.
21         ROBB ALEY ALLAN: All right.  Well, if
22 that's – all right.  Do we all confirm the
23 retention of Thiel & Reed?
24         VOICES: Yes.
25         ROBB ALEY ALLAN: Any objection?

TSG Reporting - Worldwide    877-702-9580

Page 12

1          VOICES: No.
2          ROBB ALEY ALLAN: All right, so that's
3  done.  Back to the management issue.  Michael,
4  you've already expressed that you're content to
5  have the interested parties who want to hear
6  further discussion of the management proposal be
7  directed to the 77th Street Queens meeting.  Is
8  there any objection to that by anybody?  In that
9  case, we can dispense with a discussion of the
10 issue –
11         MICHAEL BREEDE: Other, other, other
12 than a couple of additional comments that I have.
13         ROBB ALEY ALLAN: Then make them.
14 Well, let me make the proposal and then make
15 them.  That's when the proper discussion ought to
16 take place.  We've received this proposal and I'd
17 like to move the following, that we would hire
18 Armstrong Realty Management Corporation
19 effectively, effective January 1st, 2008; that we
20 would instruct Minskoff Grant Realty & Management
21 to deliver to Armstrong all of the partnership
22 assets, keys, records, money, documents and
23 other, uh, partnership assets by December 31st,
24 2007; instruct Minskoff Grant to cease all
25 leasing activity immediately.

TSG Reporting - Worldwide    877-702-9580

Page 13

1          ROYANNE MINSKOFF?: Seconded.
2          ROBB ALEY ALLAN: All right, Michael.
3  You had another point to make.
4          MICHAEL BREEDE: Two points to make.
5  I'd like to incorporate all my comments from the
6  comments from 77th.  I think you've done that,
7  correct?
8          VOICES: Yes.
9          MICHAEL BREEDE: Okay.  Secondly, you
10 know, where applicable, obviously there's some
11 things that are slightly different.  Um, uh, with
12 respect to Eric Goldschmidt, um, is anyone
13 familiar with him?
14         ROYANNE MINSKOFF: No.
15         MICHAEL BREEDE: Okay.  Royanne and
16 Alan might remember him.  Well, Royanne doesn't.
17 But he had an, an exclusive at [WYCOGIL?] for the
18 former pharmacy space that we had there.  And in
19 six months, he didn't bring anything in.  He
20 brought in one potential tenant and it wasn't a
21 very good one.  That's just for the record.
22         WOMAN: Okay.
23         MICHAEL BREEDE: Okay.  And –
24         ROBB ALEY ALLAN: Why is that name
25 being brought up here?

TSG Reporting - Worldwide    877-702-9580

## Page 14

1    MICHAEL BREEDE: Because it's
2  referenced on page 18.
3    ROBB ALEY ALLAN: Okay, thank you.
4    MICHAEL BREEDE: Okay? It's one of
5  the, uh, one of the leasing –
6    ROYANNE MINSKOFF: It's one of the
7  leasing brokers [OVERLAPPING].
8    MICHAEL BREEDE: That's right. Um,
9  secondly, I'd like to just reiterate – I have
10 three points now. Secondly I'd like to re, to
11 reiterate my concern as to why only one company
12 was, was interviewed and reviewed, you know, was
13 interviewed and, and, and not several. I think
14 it's better to take a look at several companies,
15 though I do understand the points made previously
16 by Robb. Um, it's still a concern of mine.
17 Robb, I don't know if you want to respond to
18 that.
19    ROBB ALEY ALLAN: You said you had
20 three points, I'll wait for the third.
21    MICHAEL BREEDE: Okay. Third point,
22 the current management agreement, which I will
23 send out to the same partners, um, and if Stacey
24 requests one, I'll send one to her, too. I don't
25 have her e-mail address. I guess it's on one of

## Page 15

1  the, uh, it would be on the distribution, right,
2  that was sent?
3    MAN: It should be although maybe it's
4  not, in which case I'll just send you it
5  directly.
6    MICHAEL BREEDE: All right. Um, I'll
7  send that to her. All right. The current
8  management agreement is very similar to the
9  other. Um, the one for 82nd-83rd Street Venture
10 Court-Martine is very similar to 77th Queens.
11 The current management agreement was approved by
12 a majority, it was executed by Marjorie, Trish
13 and Jean on January 1st, 2002. The termination
14 is annual. Notice has to be given by October 3rd
15 for termination on January 1st of each year. Uh,
16 you know, and again I reiterate the comments that
17 I made on 77th Queens with respect to the caution
18 that should be exercised with respect to hiring
19 an additional management company without, uh,
20 appropriately ending the relationship with the
21 current management company. And that's basically
22 it.
23    ROBB ALEY ALLAN: All right. Well, let
24 me, if you don't mind –
25    MICHAEL BREEDE: Sure.

## Page 16

1    ROBB ALEY ALLAN: - I'll answer your
2  three points, or at least two of the three. I
3  think your first point had to do with, uh, Eric
4  Goldschmidt as the leasing broker recommendations
5  in the back of the report and I'll just say what
6  I said at 77th, which is that these are just
7  recommendations. Um, these are not part and
8  parcel of any management proposal per se and I
9  think that in fact one of the advantages of this
10 management proposal is that it doesn't carry with
11 it a requirement to hire any particular leasing
12 broker or any other vendor. We have the
13 opportunity to bid the leasing work out to any
14 broker we choose and accept the one that we feel
15 is most suitable for the job, whatever the
16 recommendations might be, and anything we vote on
17 today will not have any relevance to that
18 decision, which will have to occur later.
19    With regard to your second issue about
20 only getting one proposal, I have to tell you
21 that I solicited multiple companies for proposals
22 and what I found was that we did not have
23 sufficient throw weight of property to interest
24 some of the larger firms. One of the smaller
25 firms that was going to issue a proposal backed

## Page 17

1  off when they acquired a large property in
2  Manhattan that consumed sufficient amounts of
3  their attention and time that they didn't feel
4  that they could meet our requirements to get a
5  proposal to us in a timely way and satisfy our
6  requirements for these properties. So it is
7  unfortunate that we have only one management
8  proposal on the table but it isn't because only
9  one company was approached.
10    I think this is an issue that we face
11 in our partnerships as a whole. There seems to
12 be a bit of a gap between the individually
13 managed property, owner-managed properties, and
14 the large management firms that manage commercial
15 space in Manhattan and in Westchester County.
16 There are not many mid-size management firms that
17 manage small mixed-used properties. Fortunately
18 Armstrong's principal, Mark [MASSEY?], comes from
19 [MASSEY NACKEL?], which is a very highly regarded
20 firm in New York, where he worked for a number of
21 years. And his brother is very well known. So
22 obviously Paul is not Mark, I won't pretend that
23 that's the case, but I would say that I was
24 referred to Armstrong and Mark [MASSEY?] by
25 several people, some of whom are quite prominent

Page 18

1  — I mean, quite prominent — in New York real
2  estate. So I am confident that the reputation
3  that this firm has and the reputation its
4  principal has is quite strong.
5       As to the third point, uh, once again,
6  as I've mentioned to you before, Michael, we
7  don't have the management agreements with
8  Minskoff Grant. Jean has seen fit not to give
9  them to us and the net result is I don't know
10  what the provisions are for termination. These
11  documents, if they were signed — and I, you know,
12  will express no opinion on that — were signed
13  years ago by people who are no longer partners
14  and we have never had an opportunity to see them.
15  So at this stage of the game, my view is that,
16  uh, we, I have no reason to believe that we're
17  prevented from having a meeting to discuss the
18  terms of their management or the terms of its
19  termination.
20       MICHAEL BREEDE: One moment. Um, I'd,
21  to, a rebuttal to your response, I guess. Or to
22  your comments. Um, with respect to why I bring
23  up the Eric Goldschmidt point here and, you know,
24  a couple of other recom, you know, these, these
25  referrals, these, uh, recommendations — it goes

TSG Reporting - Worldwide     877-702-9580

Page 19

1  to the quality of the recommendations, which I
2  don't think are very good. They're recommending,
3  for example, you know, somebody who we had a bad
4  experience with. Okay, it's one, one, one
5  example. But to recommend a maintenance company
6  that's not even the same county isn't really, you
7  know, I don't think a very good recommendation.
8       ROBB ALEY ALLAN: Why? Is Minskoff
9  Grant located in Westchester?
10       MICHAEL BREEDE: No. But the employees
11  are, are, are located at the site. They stay,
12  they go to the site and regularly visit the
13  sites.
14       SARA MINSKOFF ALLAN?: But they didn't
15  have employees when they were hired.
16       MICHAEL BREEDE: I can't hear you, I'm
17  sorry.
18       ROBB ALEY ALLAN: Sara's saying they
19  didn't have employees when they were hired and I
20  think the real question — are you saying that we
21  have an office at 82nd-83rd for our employees?
22       MICHAEL BREEDE: I'm saying that we
23  have regular, the person at 82nd and 83rd,
24  they're regularly at the property.
25       ROBB ALEY ALLAN: I'm not sure I agree

TSG Reporting - Worldwide     877-702-9580

Page 20

1  with that, having just visited the property. But
2  putting that issue aside, they don't reside at
3  the property, they don't have an office at the
4  property, they obviously come from somewhere
5  else. It doesn't matter to me whether they come
6  from New Jersey or New York.
7       SARA MINSKOFF ALLAN: When Minskoff
8  Grant was hired, they didn't have employees.
9  They didn't have experience. I'm not even sure
10  they had an office. So I think this company has
11  a lot more going for it.
12       ROBB ALEY ALLAN: Well in fact, this
13  company has -- and by the way, I make a
14  distinction between their office personnel and
15  their field personnel. I don't know what the
16  size of the field personnel team is for Armstrong
17  at the various properties that they manage. Uh,
18  but they manage more properties than Minskoff
19  Grant does by square footage as I understand it,
20  and by absolute numbers. So I'm not, I'm not
21  concerned about whether they're going to be
22  capable of assembling an appropriate team, by the
23  way, which has to meet our approval anyway. Uh,
24  I'm more concerned with making sure that they've
25  got a good reputation, they've got some track

TSG Reporting - Worldwide     877-702-9580

Page 21

1  record and that they are well recommended.
2       MICHAEL BREEDE: We can agree to
3  disagree. In any case, um, with respect to your
4  comments about my point that why only one company
5  was, it was brought to the partnership, uh, as a
6  potential replacement, um, now, this is subject
7  to reviewing the documents. But, you know, as I
8  see it, we have time here, uh, again, you know,
9  subject to with that qualification. We have time
10  to solicit further companies. So I would not
11  like to make a commitment to any particular
12  company until that time which current management
13  could be effectively terminated.
14       ROBB ALEY ALLAN: Well, I guess I have
15  a different view, Michael. My feeling is that
16  every day that goes by that the operation, the
17  property is operated the way it's operated and
18  that the partnership functions the way it
19  functions, uh, is disadvantageous. I think that
20  all of these properties — but I'll talk only
21  about this one -- suffer from a lack of the
22  ability of the owners to communicate and to meet
23  and to adequately discuss and make decisions and
24  from an inability to have thorough, transparent
25  communications with its own manager and its

TSG Reporting - Worldwide     877-702-9580

Page 22

1  leasing agent. And I feel at this stage of the
2  game that it would be –
3          MICHAEL BREEDE: I respect your, while
4  I respect your opinion, I, I do disagree. I
5  don't think that the manager is necessarily the
6  issue. I think it's ownership. As I pointed out
7  recently, I think we have different goals and
8  objectives for the properties and I think there's
9  a much larger issue here. And I think that issue
10 should be addressed, not in this –
11         ROBB ALLEY ALLAN: You can say that
12 Michael, but I will tell you –
13         MICHAEL BREEDE: - not in this forum.
14         ROBB ALLEY ALLAN: You can say so,
15 Michael, but I will tell you that T. Grant
16 publicly boasts that he refuses to speak to me
17 and has refused to speak to me for eight years.
18 And he is our leasing agent. How am I supposed
19 to have confidence in the performance of our
20 leasing agent when he refuses to talk to me as an
21 owner. So I don't, I think that's inadequate
22 performance.
23         SARA MINSKOFF ALLAN: And I have to say
24 that it's obvious that partners are not treated
25 equally. And a perfect example is the fact that

TSG Reporting - Worldwide    877-702-9580

Page 23

1  some partners have the management agreement and
2  some partners don't.
3          MICHAEL BREEDE: Well, actually some of
4  those partners who signed the management
5  agreement don't have a copy. So what's that
6  about? You know, I mean, it went by Idaho, you
7  know, and it was signed and –
8          ROBB ALEY ALLAN: Yeah, and I guess you
9  have to ask the question, why isn't it
10 distributed to all of the partners, so –
11         WOMAN: I'm sorry.
12         ROBB ALEY ALLAN: - listen, this isn't
13 a [OVERLAPPING].
14         MICHAEL BREEDE: It was also
15 distributed, it was also distributed to you for
16 signature. But that's, that's neither here nor
17 there. I mean, we could go on forever. The
18 bottom line to me is that – and which is why I'm
19 taking, and if you want, we can stop the
20 recording and have a little chat if you –
21         ROYANNE MINSKOFF?: No, no, because I
22 have some, I have some points to make on the
23 Armstrong proposals that I would like the
24 opportunity –
25         MICHAEL BREEDE: Fair enough. Go

TSG Reporting - Worldwide    877-702-9580

Page 24

1  ahead.
2          ROBB ALEY ALLAN: Well, this call could
3  run a little long because it's the last call.
4  Look, I'll just make my final point. This is not
5  a session to beat up Minskoff Grant, that's not
6  what this is about. Uh, I personally think a
7  change in management would be nothing but
8  advantageous for this partnership and for any
9  other partnership, Michael. I, I, one of the
10 things that I think has been so unfortunate for
11 all of us over the past few years has been that
12 we have been divided as a family and unable to
13 communicate on a regular basis, on an equal
14 basis, with regard to what should happen with
15 these properties. Your view that we have a
16 fundamental difference about the outlook of these
17 properties I have a feeling is not really true
18 and I think it's colored by the divisions within
19 the family.
20         What we need to try to do is get past
21 those divisions so that these properties can be
22 operated to everybody's satisfaction in a
23 consensual manner. And that's not been the case.
24 The engagement of an outside, non-family-related
25 management firm that has the sufficient capacity

TSG Reporting - Worldwide    877-702-9580

Page 25

1  and skills to perform to our satisfaction I think
2  can only be an advantage to us.
3          MICHAEL BREEDE: Well, I respectfully
4  disagree. You know, having lived through the
5  experience with previous management, uh, not, you
6  know, uh, can't remember the name of them.
7          ROYANNE MINSKOFF: [MENDIC?]?
8          MICHAEL BREEDE: [MENDIC?], yeah.
9  [OVERLAPPING VOICES]
10         ROBB ALEY ALLAN: ... a reflection of
11 [MENDIC?] being a very large management firm that
12 really wasn't suited to manage these properties
13 at this scale and this firm is.
14         MICHAEL BREEDE: But again, you know,
15 we can, again, I can, we can disagree here. But
16 I feel that, you know, we have different goals,
17 different objectives and –
18         ROYANNE MINSKOFF?: What are your
19 goals, Michael?
20         MICHAEL BREEDE: - and, and the best
21 way to resolve this is through some kind of buy-
22 sell and I don't think [UNINTEL] going to work
23 and that's just where my position is.
24         ROBB ALEY ALLAN: So, I mean, if your
25 goals are somewhat other than to have a property

TSG Reporting - Worldwide    877-702-9580

**Page 26**

1 that performs as smoothly as possible, makes as
2 much money as possible with as little risk and
3 discord as possible, I'd like to hear what they
4 are. That's what my goals are.
5     MICHAEL BREEDE: Well, again, I don't
6 think this is a forum for this. Um, we, we, I
7 think we did what we, um, you know, what you came
8 to do, um, you know, you voted and I don't know
9 if we've actually voted on this one –
10     [OVERLAPPING VOICES]
11     ROBB ALEY ALLAN: ... in that case you
12 raised the issue. I'm only answering it.
13     MICHAEL BREEDE: I, I know. I'm just
14 saying that we could go on for a long time here
15 and maybe we should close out the vote.
16     ROBB ALEY ALLAN: Well, all right. In
17 that case, I will move for a second and a – I
18 think we have a second and for a vote on the
19 motion as presented. All in favor?
20     WOMAN: Aye.
21     ROBB ALEY ALLAN: All opposed?
22     MICHAEL BREEDE: Aye.
23     ROBB ALEY ALLAN: Now, we now have to
24 have a subvote for Court-Martine [LAUGHTER]. So
25 on behalf of Court-Martine, Court-Martine &

TSG Reporting - Worldwide     877-702-9580

**Page 27**

1 Associates, yes, Court-Martine Associates, all in
2 favor?
3     ROYANNE MINSKOFF: Aye.
4     ROBB ALEY ALLAN: All opposed?
5     MICHAEL BREEDE: Aye.
6     ROBB ALEY ALLAN: A majority of Court-
7 Martine votes in favor and Court-Martine is, of
8 course, a majority of 82nd-83rd, so that carries
9 and the motion is passed. Uh, I don't know at
10 this stage of the game if we simply should
11 adjourn this meeting and continue to have a
12 conversation or what anybody would like to do.
13     MICHAEL BREEDE: I think that's a good
14 idea, just to have a, you know, we can have a
15 brief discussion after, you know, after you close
16 the meeting out. I think that's a great idea.
17     ROBB ALEY ALLAN: Royanne, are you in
18 favor of that?
19     ROYANNE MINSKOFF: I'll move to
20 adjourn.
21     SARA MINSKOFF ALLAN: I'll second.
22     ROBB ALEY ALLAN: All in favor?
23     VOICES: Yes. Aye.
24     ROBB ALEY ALLAN: All right. In that
25 case, we are adjourned and I'm going to suspend

TSG Reporting - Worldwide     877-702-9580

**Page 28**

1 recording of this call, so hold on one second.
2     [PHONE BEEPS]
3     [END OF TAPE]

TSG Reporting - Worldwide     877-702-9580

**Page 29**

1 A Plus Recording and Transcribing, a division of
2 A Plus Office Support Systems, states that the
3 preceding transcript was created by one of its
4 employees using standard electronic transcription
5 equipment and is a true and accurate record of
6 the audio on the provided media to the best of
7 that employee's ability. The media from which we
8 worked was provided to us. We can make no
9 statement as to its authenticity.

11     Attested to by:

14     Patrick Weaver

TSG Reporting - Worldwide     877-702-9580

| A | | | | |
|---|---|---|---|---|
| **ability (2)** 21:22 29:7 | **agreement (5)** 14:22 15:8,11 23:1,5 | **answering (1)** 26:12 | **basically (1)** 15:21 | **brokers (1)** 14:7 |
| **absolute (1)** 20:20 | **agreements (1)** 18:7 | **anybody (1)** 3:15 9:9 12:8 27:12 | **basis (2)** 24:13,14 | **brother (1)** 17:21 |
| **accept (1)** 16:14 | **ahead (1)** 24:1 | **anyway (1)** 20:23 | **beat (1)** 24:5 | **brought (3)** 13:20,25 21:5 |
| **accurate (1)** 29:5 | **Alan (2)** 3:23 13:16 | **applicable (1)** 13:10 | **beep (3)** 2:1 5:2,9 | **buy (1)** 25:21 |
| **acquired (1)** 17:1 | **ALEY (70)** 2:3,15,18,21,25 3:3,6 3:19 4:1,3,6,10,19 | **approached (1)** 17:9 | **BEEPS (1)** 28:2 | |
| **act (1)** 3:10 | 4:23 5:1,5,8,11,14 5:17 6:3,10,22 7:4,9 | **appropriate (1)** 20:22 | **behalf (15)** 2:11,12,15,18 3:11,20 3:21 4:3,6,23 5:9,21 | C |
| **activity (1)** 12:25 | 7:13,15,18,21,25 8:3,7,14,24 9:6,21 | **appropriately (1)** 15:20 | 6:25 8:1 26:25 | **call (10)** 2:10 5:6 7:10 9:1 8 |
| **add (1)** 2:6 | 10:23 11:4,11,15,17 11:21,25 12:2,13 | **approval (1)** 20:23 | **believe (2)** 10:13 18:16 | 10:16,17 11:13 24:2 24:3 28:1 |
| **addition (1)** 2:7 | 13:2,24 14:3,19 15:23 16:1 19:8,18 | **approved (2)** 10:4 15:11 | **BELLO (1)** 10:1 | **capable (1)** 20:22 |
| **additional (2)** 12:12 15:19 | 19:25 20:12 21:14 23:8,12 24:2 25:10 | **Armstrong (6)** 10:9 12:18,21 17:24 | **best (2)** 25:20 29:6 | **capacity (1)** 24:25 |
| **address (1)** 14:25 | 25:24 26:11,16,21 26:23 27:4,6,17,22 | 20:16 23:23 | **better (1)** 14:14 | **carries (2)** 7:23 27:8 |
| **addressed (1)** 22:10 | 27:24 | **Armstrong's (1)** 17:18 | **bid (1)** 16:13 | **carry (1)** 16:10 |
| **adequately (1)** 21:23 | **Allan (81)** 2:3,15,16,17,18,21,25 3:3,6,19 4:1,3,4,5,6 | **aside (1)** 20:2 | **bit (1)** 17:12 | **case (8)** 12:9 15:4 17:23 21:3 24:23 26:11,17 |
| **adjourn (3)** 8:4 27:11,20 | 4:10,19,23 5:1,5,8 5:11,14,17 6:3,10 | **assembling (1)** 20:22 | **boasts (1)** 22:16 | 27:25 |
| **adjourned (1)** 27:25 | 6:22 7:4,9,12,13,15 7:18,21,25 8:3,7,14 | **assets (2)** 12:22,23 | **bottom (1)** 23:18 | **cause (1)** 6:17 |
| **advanced (1)** 10:1 | 8:24 9:6,21 10:23 11:4,11,15,17,21,25 | **Associates (9)** 2:8,12 3:7,11,14 6:24 | **Breede (59)** 2:19,20,23 3:1,2,5,17 | **caution (1)** 15:17 |
| **advantage (1)** 25:2 | 12:2,13 13:2,24 14:3,19 15:23 16:1 | 7:1 27:1,1 | 4:7,8,13,22,25 5:4 5:13,23 6:8,12 7:17 | **cease (1)** 12:24 |
| **advantageous (1)** 24:8 | 19:8,14,18,25 20:7 20:12 21:14 22:11 | **attention (1)** 17:3 | 7:20,24 8:2,5,9 10:21,24 11:6,14,16 | **change (2)** 1:13 24:7 |
| **advantages (1)** 16:9 | 22:14,23 23:8,12 24:2 25:10,24 26:11 | **Attested (1)** 29:11 | 11:18 12:11 13:4,9 13:15,23 14:1,4,8 | **chat (1)** 23:20 |
| **affirm (1)** 10:25 | 26:16,21,23 27:4,6 27:17,21,22,24 | **audio (1)** 29:6 | 14:21 15:6,25 18:20 19:10,16,22 21:2 | **choose (1)** 16:14 |
| **affirming (2)** 11:6,7 | **ALLEY (2)** 22:11,14 | **authenticity (1)** 29:9 | 22:3,13 23:3,14,25 25:3,8,14,20 26:5 | **circulated (2)** 10:11,12 |
| **agenda (1)** 10:6 | **alternative (1)** 9:24 | **aye (9)** 7:12,13,14,15 26:20 | 26:13,22 27:5,13 | **circumstances (1)** 4:16 |
| **agent (3)** 22:1,18,20 | **amounts (1)** 17:2 | 26:22 27:3,5,23 | **brief (1)** 27:15 | **close (2)** 26:15 27:15 |
| **ago (1)** 18:13 | **annual (1)** 15:14 | | **briefly (1)** 9:17 | **Coast (1)** 2:6 |
| **agree (2)** 19:25 21:2 | **answer (1)** 16:1 | B | **bring (2)** 13:19 18:22 | **colored (1)** 24:18 |
| | | **back (4)** 4:20 9:10 12:3 16:5 | **broker (3)** 16:4,12,14 | **come (2)** 20:4,5 |
| | | **backed (1)** 16:25 | | **comes (1)** |
| | | **bad (1)** 19:3 | | |

17:18
**comfortable (1)**
9:2
**comments (6)**
12:12 13:5,6 15:16
18:22 21:4
**commercial (1)**
17:14
**commitment (1)**
21:11
**communicate (2)**
21:22 24:13
**communications (1)**
21:25
**companies (3)**
14:14 16:21 21:10
**company (9)**
14:11 15:19,21 17:9
19:5 20:10,13 21:4
21:12
**Con (1)**
11:17
**concern (2)**
14:11,16
**concerned (2)**
20:21,24
**conclusion (1)**
11:8
**conclusions (1)**
10:25
**confidence (1)**
22:19
**confident (1)**
18:2
**confirm (1)**
11:22
**confirmed (3)**
11:14,16,18
**confused (3)**
4:14 6:1 8:13
**consensual (1)**
24:23
**consumed (1)**
17:2
**content (1)**
12:4
**continue (1)**
27:11
**conversation (2)**
10:19 27:12
**copy (1)**

23:5
**Corp (1)**
10:9
**Corporation (1)**
12:18
**correct (2)**
3:25 13:7
**county (2)**
17:15 19:6
**couple (2)**
12:12 18:24
**course (1)**
27:8
**Court (4)**
2:7 6:23,25 27:6
**Court-Martine (23)**
2:11 3:7,10,14 5:20
5:21,25 6:4,11,18
8:1,4,15,19 9:3,11
11:10 15:10 26:24
26:25,25 27:1,7
**created (1)**
29:3
**cumbersome (1)**
8:25
**current (8)**
9:15 10:7 11:12 14:22
15:7,11,21 21:12
**currently (1)**
10:16

_____D_____

**David (2)**
10:2,3
**day (1)**
21:16
**December (1)**
12:23
**decision (1)**
16:18
**decisions (1)**
21:23
**DEL (1)**
10:1
**deleted (1)**
9:10
**deliver (1)**
12:21
**designated (1)**
8:17
**dialed (1)**

5:18
**difference (2)**
6:14 24:16
**different (5)**
13:11 21:15 22:7
25:16,17
**direct (1)**
10:19
**directed (1)**
12:7
**directly (1)**
15:5
**disadvantageous (1)**
21:19
**disagree (4)**
21:3 22:4 25:4,15
**discord (1)**
26:3
**discuss (2)**
18:17 21:23
**discussed (1)**
9:14
**discussion (6)**
10:7,15 12:6,9,15
27:15
**dispense (1)**
12:9
**distinction (1)**
20:14
**distributed (3)**
23:10,15,15
**distribution (1)**
15:1
**divided (1)**
24:12
**division (1)**
29:1
**divisions (2)**
24:18,21
**documents (3)**
12:22 18:11 21:7
**dropped (1)**
5:19

_____E_____

**easiest (1)**
8:20
**East (1)**
2:6
**easy (1)**
3:12

**effective (1)**
12:19
**effectively (2)**
12:19 21:13
**eight (1)**
22:17
**either (1)**
8:17
**electronic (1)**
29:4
**electronically (1)**
10:11
**employees (6)**
19:10,15,19,21 20:8
29:4
**employee's (1)**
29:7
**empowered (2)**
9:19,22
**engagement (1)**
24:24
**equal (1)**
24:13
**equally (1)**
22:25
**equipment (1)**
29:5
**Equities (3)**
2:12 3:21,22
**Eric (3)**
13:12 16:3 18:23
**establish (2)**
3:8 4:19
**estate (1)**
18:2
**everybody's (2)**
10:13 24:22
**example (3)**
19:3,5 22:25
**exclusive (1)**
13:17
**executed (1)**
15:12
**exercised (1)**
15:18
**experience (3)**
19:4 20:9 25:5
**express (1)**
18:12
**expressed (1)**
12:4

**extensive (1)**
10:14
**e-mail (1)**
14:25

_____F_____

**face (1)**
17:10
**fact (4)**
2:22 16:9 20:12 22:25
**fair (2)**
3:18 23:25
**familiar (1)**
13:13
**family (2)**
24:12,19
**favor (6)**
7:11 26:19 27:2,7,18
27:22
**February (1)**
9:19
**feel (4)**
16:14 17:3 22:1 25:16
**feeling (2)**
21:15 24:17
**field (2)**
20:15,16
**file (1)**
6:9
**final (1)**
24:4
**firm (5)**
17:20 18:3 24:25
25:11,13
**firms (4)**
16:24,25 17:14,16
**first (3)**
4:20 11:1 16:3
**fit (1)**
18:8
**following (1)**
12:17
**footage (1)**
20:19
**forever (1)**
23:17
**form (2)**
8:25 10:12
**former (1)**
13:18
**Fortunately (1)**

17:17
**forum (2)**
22:13 26:6
**found (1)**
16:22
**functions (2)**
21:18,19
**fundamental (1)**
24:16
**further (2)**
12:6 21:10

**G**

**game (3)**
18:15 22:2 27:10
**gap (1)**
17:12
**getting (1)**
16:20
**give (1)**
18:8
**given (1)**
15:14
**go (6)**
4:20 6:17 19:12 23:17
23:25 26:14
**goals (5)**
22:7 25:16,19,25 26:4
**goes (2)**
18:25 21:16
**going (8)**
2:9 3:9 6:19 16:25
20:11,21 25:22
27:25
**Goldschmidt (3)**
13:12 16:4 18:23
**good (5)**
13:21 19:2,7 20:25
27:13
**gotten (1)**
3:4
**Grant (8)**
12:20,24 18:8 19:9
20:8,19 22:15 24:5
**great (1)**
27:16
**guess (5)**
4:24 14:25 18:21
21:14 23:8
**guise (1)**
10:2,4

**H**

**half (2)**
6:10,23
**Hang (1)**
6:16
**happen (1)**
24:14
**hear (3)**
12:5 19:16 26:3
**heard (1)**
5:8
**Hello (3)**
2:2 5:6,7
**highly (1)**
17:19
**hire (2)**
12:17 16:11
**hired (3)**
19:15,19 20:8
**hiring (1)**
15:18
**hold (2)**
6:8 28:1

**I**

**Idaho (1)**
23:6
**idea (2)**
27:14,16
**immediately (2)**
8:3 12:25
**important (1)**
6:14
**inability (1)**
21:24
**inadequate (1)**
22:21
**INAUDIBLE (1)**
9:20
**incorporate (1)**
13:5
**incorrect (2)**
4:11 6:6
**individually (2)**
6:5 17:12
**instruct (2)**
12:20,24
**interest (7)**
4:9 6:10 7:22,22 9:3,4
16:23
**interested (2)**

10:19 12:5
**interviewed (2)**
14:12,13
**issue (12)**
10:6 11:1 12:3,10
16:19,25 17:10 20:2
22:6,9,9 26:12

**J**

**January (3)**
12:19 15:13,15
**Jean (2)**
15:13 18:8
**Jersey (1)**
20:6
**job (1)**
16:15
**joined (1)**
5:6

**K**

**keys (1)**
12:22
**kind (2)**
11:12 25:21
**know (28)**
8:19 11:4 13:10 14:12
14:17 15:16 18:9,11
18:23,24 19:3,7
20:15 21:7,8 23:6,7
25:4,6,14,16 26:7,8
26:8,13 27:9,14,15
**known (2)**
17:21

**L**

**lack (1)**
21:21
**large (3)**
17:1,14 25:11
**larger (4)**
4:18 6:15 16:24 22:9
**LAUGHTER (4)**
6:11,23 7:6 26:24
**leasing (9)**
12:25 14:5,7 16:4,11
16:13 22:1,18,20
**legal (5)**
9:16,18,24 11:2,12
**letting (2)**
9:2,4

**Let's (3)**
6:22 8:22 9:1
**line (1)**
23:18
**list (1)**
4:10
**listen (1)**
23:12
**little (4)**
4:14 23:20 24:3 26:2
**lived (1)**
25:4
**LLC (2)**
2:16,19
**located (2)**
19:9,11
**long (2)**
24:3 26:14
**longer (1)**
18:13
**look (2)**
14:14 24:4
**looking (1)**
6:16
**lot (1)**
20:11
**LP (1)**
2:13

**M**

**maintenance (1)**
19:5
**majority (4)**
7:22 15:12 27:6,8
**making (2)**
7:5 20:24
**MAN (3)**
2:2 5:7 15:3
**manage (5)**
17:14,17 20:17,18
25:12
**managed (1)**
17:13
**management (30)**
1:13 2:13 9:16 10:7,8
10:9,10 12:3,6,18
12:20 14:22 15:8,11
15:19,21 16:8,10
17:7,14,16 18:7,18
21:12 23:1,4 24:7
24:25 25:5,11

**manager (2)**
21:25 22:5
**Manhattan (2)**
17:2,15
**manner (1)**
24:23
**Marjorie (1)**
15:12
**Mark (3)**
17:18,22,24
**Martine (4)**
2:8 6:24 7:1 27:7
**MASSEY (3)**
17:18,19,24
**matter (1)**
20:5
**mean (4)**
18:1 23:6,17 25:24
**means (2)**
10:23 11:5
**media (2)**
29:6,7
**meet (3)**
17:4 20:23 21:22
**meeting (9)**
1:13 2:4,7 3:9 7:2
9:15 18:17 27:11,16
**memorializing (1)**
11:9
**MENDIC (3)**
25:7,8,11
**mentioned (2)**
9:25 18:6
**Michael (72)**
2:19,20,23 3:1,2,4,5
3:17 4:7,8,13,22,25
5:3,4,13,19,23 6:8
6:12 7:16,17,19,20
7:24 8:2,5,9 10:21
10:24 11:6,14,16,18
12:3,11 13:2,4,9,15
13:23 14:1,4,8,21
15:6,25 18:6,20
19:10,16,22 21:2,15
22:3,12,13,15 23:3
23:14,25 24:9 25:3
25:8,14,19,20 26:5
26:13,22,22 27:5,13
**mid-size (1)**
17:16
**mind (1)**

15:24
mine (1)
14:16
Minskoff (38)
2:13,14,16,17 3:13,24
3:25 4:2,4,5 5:9,16
6:25 7:8,12,14 8:10
8:22 9:1 12:20,24
13:1,14 14:6 18:8
19:8,14 20:7,7,18
22:23 23:21 24:5
25:7,18 27:3,19,21
misunderstood (1)
4:16
mixed-used (1)
17:17
moment (1)
18:20
Monday (1)
10:13
money (2)
12:22 26:2
months (1)
13:19
motion (11)
4:21 5:19 7:5 8:20 9:7
9:7,12 10:22,25
26:19 27:9
motion's (1)
9:10
move (5)
3:8 6:24 12:17 26:17
27:19
moving (1)
5:22
multiple (1)
16:21
MYCA (1)
2:15

**N**

NACKEL (1)
17:19
name (2)
13:24 25:6
nay (2)
7:17,18
necessarily (1)
22:5
need (2)
3:8 24:20

neither (1)
23:16
net (1)
18:9
never (1)
18:14
New (4)
17:20 18:1 20:6,6
Nobody's (1)
9:9
NOISE (1)
5:3
nominate (2)
3:13 6:24
non-family-related ...
24:24
Notice (1)
15:14
November (1)
2:5
number (1)
17:20
numbers (1)
20:20

**O**

objection (3)
3:19 11:25 12:8
objectives (2)
22:8 25:17
obvious (1)
22:24
obviously (3)
13:10 17:22 20:4
occur (1)
16:18
October (1)
15:14
office (5)
19:21 20:3,10,14 29:2
oh (3)
2:23,23 3:5
Okay (13)
4:22 6:18,20 8:9 9:9
13:9,15,22,23 14:3
14:4,21 19:4
OLISOFF (2)
10:3,3
once (1)
18:5
operated (3)

21:17,17 24:22
operation (1)
21:16
opinion (2)
18:12 22:4
opportunity (3)
16:13 18:14 23:24
opposed (5)
8:6 9:9,9 26:21 27:4
ought (1)
12:15
outlook (1)
24:16
outside (1)
24:24
outvoted (1)
7:19
OVERLAPPING (7)
3:4 5:23 6:7 14:7
23:13 25:9 26:10
owner (3)
5:2,2 22:21
owners (1)
21:22
ownership (2)
4:18 22:6
owner-managed (1)
17:13

**P**

page (1)
14:2
paper (1)
10:12
parcel (1)
16:8
part (1)
16:7
particular (2)
16:11 21:11
parties (3)
10:15,20 12:5
partner (1)
3:13
partners (11)
2:4,9 8:18 10:11
14:23 18:13 22:24
23:1,2,4,10
partnership (10)
9:23,25 11:3,19 12:21
12:23 21:5,18 24:8

24:9
partnerships (1)
17:11
passed (2)
9:8 27:9
Patricia (1)
4:6
Patrick (1)
29:14
Patrish (1)
6:4
Paul (1)
17:22
people (2)
17:25 18:13
percent (1)
7:22
percentage (1)
6:15
perfect (1)
22:25
perform (1)
25:1
performance (2)
22:19,22
performs (1)
26:1
person (1)
19:23
personal (1)
4:9
personally (1)
24:6
personnel (3)
20:14,15,16
pharmacy (1)
13:18
PHONE (1)
28:2
Pi (1)
3:1
Pisces (7)
2:24 3:1 4:11,17,24
6:1,18
place (1)
12:16
Plus (2)
29:1,2
point (7)
13:3 14:21 16:3 18:5
18:23 21:4 24:4

pointed (1)
22:6
points (6)
13:4 14:10,15,20 16:2
23:22
position (1)
25:23
possible (3)
26:1,2,3
potential (2)
13:20 21:6
preceding (1)
29:3
present (6)
2:14,17,20 3:2 4:2,5
presented (2)
9:12 26:19
pretend (1)
17:22
prevented (1)
18:17
previous (2)
9:10 25:5
previously (2)
10:1 14:15
principal (2)
17:18 18:4
probably (1)
6:6
prominent (2)
17:25 18:1
proper (1)
12:15
properly (1)
7:10
properties (11)
17:6,13,17 20:17,18
21:20 22:8 24:15,17
24:21 25:12
property (11)
8:12 10:10 16:23 17:1
17:13 19:24 20:1,3
20:4 21:17 25:25
proposal (10)
10:8 12:6,14,16 16:8
16:10,20,25 17:5,8
proposals (2)
16:21 23:23
proposed (1)
5:24
proposing (1)

5:22
**provided (2)**
29:6,8
**provisions (1)**
18:10
**publicly (1)**
22:16
**purpose (2)**
3:15 9:14
**purposes (1)**
7:2
**putting (1)**
20:2

**Q**

**qualification (1)**
21:9
**quality (1)**
19:1
**Queens (6)**
9:14 10:16 11:2 12:7
 15:10,17
**question (3)**
8:11 19:20 23:9
**quite (3)**
17:25 18:1,4
**quorum (3)**
2:22,22 3:6

**R**

**raised (1)**
26:12
**real (2)**
18:1 19:20
**really (3)**
19:6 24:17 25:12
**Realty (3)**
10:9 12:18,20
**reason (2)**
8:11 18:16
**rebuttal (1)**
18:21
**received (3)**
10:8,14 12:16
**recom (1)**
18:24
**recommend (1)**
19:5
**recommendation (1)**
19:7
**recommendations (5)**

16:4,7,16 18:25 19:1
**recommended (1)**
21:1
**recommending (1)**
19:2
**reconvene (1)**
8:4
**record (11)**
2:4,11 3:23 5:2 6:3
 9:16,22 10:8 13:21
 21:1 29:5
**recording (4)**
12:7 23:20 28:1 29:1
**records (1)**
12:22
**Reed (3)**
10:2,4 11:23
**referenced (1)**
14:2
**referrals (1)**
18:25
**referred (1)**
17:24
**reflection (1)**
25:10
**refused (1)**
22:17
**refuses (2)**
22:16,20
**regard (4)**
5:20 9:23 16:19 24:14
**regarded (1)**
17:19
**regular (2)**
19:23 24:13
**regularly (2)**
19:12,24
**rehash (1)**
10:18
**reiterate (4)**
9:17 14:9,11 15:16
**relationship (1)**
15:20
**relevance (1)**
16:17
**remake (1)**
4:20
**remember (2)**
13:16 25:6
**replacement (1)**
21:6

**report (1)**
16:5
**represent (2)**
8:8 9:23
**representation (2)**
9:24 11:2
**representative (3)**
3:10,14 8:17
**representing (2)**
9:11 11:19
**reputation (3)**
18:2,3 20:25
**requests (1)**
14:24
**requirement (1)**
16:11
**requirements (2)**
17:4,6
**rescind (1)**
9:7
**reside (1)**
20:2
**resolve (1)**
25:21
**respect (11)**
11:1,2,8,9 13:12
 15:17,18 18:22 21:3
 22:3,4
**respectfully (1)**
25:3
**respond (1)**
14:17
**response (1)**
18:21
**result (2)**
18:9
**retain (1)**
6:15
**retained (1)**
10:5
**retention (1)**
11:23
**review (1)**
9:15
**reviewed (1)**
14:12
**reviewing (1)**
21:7
**right (27)**
2:3,21 3:20 4:10 5:5
 5:11,17,19,24 6:1

6:17 7:4,9 9:6,13
 11:20,21,22 12:2
 13:2 14:8 15:1,6,7
 15:23 26:16 27:24
**risk (1)**
26:2
**Robb (74)**
2:3,15,18,21,25 3:3,6
 3:19 4:1,3,6,10,19
 4:23 5:1,5,8,11,14
 5:17 6:3,10,22 7:4,9
 7:13,15,18,21,25
 8:3,7,14,24 9:6,21
 10:23 11:4,11,15,17
 11:21,25 12:2,13
 13:2,24 14:3,16,17
 14:19 15:23 16:1
 19:8,18,25 20:12
 21:14 22:11,14 23:8
 23:12 24:2 25:10,24
 26:11,16,21,23 27:4
 27:6,17,22,24
**roll (2)**
2:10 4:20
**Royanne (30)**
2:13,14 3:13,20,23,25
 4:1,2 5:14,16 6:25
 7:6,8,14,25 8:10,22
 9:1,22 13:1,14,15
 13:16 14:6 23:21
 25:7,18 27:3,17,19
**Royanne's (1)**
7:15
**run (1)**
24:3

**S**

**Sara (12)**
2:16,17 4:3,4,5 7:12
 9:8,8 19:14 20:7
 22:23 27:21
**Sara's (2)**
7:13 19:18
**satisfaction (2)**
24:22 25:1
**satisfy (1)**
17:5
**saying (6)**
4:11 6:13 19:18,20,22
 26:14
**scale (1)**

25:13
**Scorpio (5)**
2:19 4:17,18 6:2,4
**scratch (1)**
6:23
**se (1)**
16:8
**second (13)**
3:16,17 6:20 7:3,5,6,8
 9:8 16:19 26:17,18
 27:21 28:1
**seconded (4)**
4:15 7:10 9:8 13:1
**seconding (1)**
4:17
**secondly (3)**
13:9 14:9,10
**see (3)**
4:13 18:14 21:8
**seeking (1)**
9:24
**seen (1)**
18:8
**sell (1)**
25:22
**send (4)**
14:23,24 15:4,7
**sent (1)**
15:2
**separately (1)**
2:10
**services (3)**
9:16,18 11:12
**session (1)**
24:5
**shows (1)**
6:3
**signature (1)**
23:16
**signed (4)**
18:11,12 23:4,7
**similar (2)**
15:8,10
**simply (2)**
9:17 27:10
**site (2)**
19:11,12
**sites (1)**
19:13
**six (1)**
13:19

size (1)
20:16
skills (1)
25:1
slightly (1)
13:11
small (1)
17:17
smaller (1)
16:24
smoothly (1)
26:1
solicit (1)
21:10
solicited (1)
16:21
somebody (3)
5:18 6:20 19:3
somewhat (1)
25:25
sorry (5)
2:25 3:5,22 19:17
    23:11
sounded (1)
5:18
space (2)
13:18 17:15
speak (7)
5:20 6:25 7:25 8:5,16
    22:16,17
square (1)
20:19
Stacey (2)
5:9 14:23
stage (3)
18:15 22:1 27:10
standard (1)
29:4
statement (1)
29:9
states (1)
29:2
status (1)
9:15
stay (1)
19:11
stop (1)
23:19
Street (6)
2:5 7:1 10:20 11:13
    12:7 15:9

strong (1)
18:4
subject (2)
21:6,9
subpartnership (1)
2:8
subvote (1)
26:24
sub-voted (1)
8:18
suffer (1)
21:21
sufficient (3)
16:23 17:2 24:25
suggest (1)
3:12
suitable (1)
16:15
suited (1)
25:12
Support (1)
29:2
supposed (1)
22:18
sure (4)
15:25 19:25 20:9,24
suspend (1)
27:25
Systems (1)
29:2

**T**

T (1)
22:15
table (1)
17:8
take (3)
9:6 12:16 14:14
talk (2)
21:20 22:20
TAPE (1)
28:3
team (2)
20:16,22
tell (2)
6:17 16:20 22:12,15
tenant (1)
13:20
terminated (1)
21:13
termination (4)

15:13,15 18:10,19
terms (2)
18:18,18
thank (1)
14:3
they've (2)
20:24,25
Thiel (2)
10:2,4 11:23
thing (1)
11:7
things (3)
3:8 13:11 24:10
think (35)
3:7,12 4:14 5:12 6:5
    8:15,19 10:17 11:11
13:6 14:13 16:3,9
17:10 19:2,7,20
20:10 21:19 22:5,6
22:7,8,9,21 24:6,10
24:18 25:1,22 26:6
26:7,18 27:13,16
third (3)
14:20,21 18:5
thorough (1)
21:24
thought (2)
4:16 5:8
three (4)
14:10,20 16:2,2
throw (1)
16:23
time (6)
2:6 17:3 21:8,9,12
    26:14
timely (1)
17:5
today (1)
16:17
total (1)
8:12
track (1)
20:25
Transcribing (1)
29:1
transcript (1)
29:3
transcription (1)
29:4
transparent (1)
21:24

treated (1)
22:24
Trish (1)
15:12
true (2)
24:17 29:5
try (1)
24:20
two (3)
8:16 13:4 16:2

**U**

uh (31)
2:5 3:6,19,21 4:8,15
    8:15,19 9:11 10:4
10:14,14 12:23
13:11 14:5 15:1,15
15:19 16:3 18:5,16
18:25 20:17,23 21:5
21:8,19 24:6 25:5,6
27:9
Uh-huh (1)
8:2
um (18)
2:15 7:24 9:2 13:11
    13:12 14:8,16,23
15:6,9 16:7 18:20
18:22 21:3,6 26:6,7
26:8
unable (1)
24:12
unanimous (1)
2:22
understand (6)
5:24 6:12 7:20,24
    14:15 20:19
unfortunate (2)
17:7 24:10
UNINTEL (1)
25:22
unnecessary (1)
10:17

**V**

various (1)
20:17
vendor (1)
16:12
Venture (3)
2:5 7:2 15:9
view (3)

18:15 21:15 24:1 5
visit (1)
19:12
visited (1)
20:1
VOICES (8)
6:7 11:20,24 12:1
    13:8 25:9 26:10
27:23
vote (17)
3:11,15 5:21 6:16,22
    7:10 8:6,7,12,18 9:3
9:4,11 11:12 16:16
26:15,18
voted (2)
26:8,9
votes (1)
27:7

**W**

wait (1)
14:20
want (6)
3:16 6:15 9:21 12:5
    14:17 23:19
wasn't (2)
13:20 25:12
way (9)
8:15,21,23 17:5 20:13
    20:23 21:17,18
25:21
ways (1)
8:16
Weaver (1)
29:14
weekend (1)
10:13
weight (1)
16:23
went (1)
23:6
Westchester (2)
17:15 19:9
we're (2)
9:10 18:16
we've (4)
10:8,14 12:16 26:9
withdrawn (1)
10:2
WOMAN (6)
5:10 7:3 9:20 13:22

23:11 26:20
**work (2)**
16:13 25:22
**worked (2)**
17:20 29:8
**wouldn't (1)**
8:14
**WYCOGIL (1)**
13:17

---
**Y**
---

**yeah (4)**
3:17 9:1 23:8 25:8
**year (1)**
15:15
**years (4)**
17:21 18:13 22:17
24:11
**year-ends (1)**
6:16
**York (3)**
17:20 18:1 20:6

---
**1**
---

**1 (1)**
1:13
**1st (3)**
12:19 15:13,15
**18 (1)**
14:2

---
**2**
---

**2002 (1)**
15:13
**2007 (1)**
12:24
**2008 (1)**
12:19
**2220 (3)**
2:12 3:21,22

---
**3**
---

**3rd (1)**
15:14
**30th (1)**
2:6
**31st (1)**
12:23

---
**4**
---

**4:02 (1)**

2:6
**41 (1)**
7:22
**4120 (1)**
6:19

---
**7**
---

**77 (1)**
11:2
**77th (10)**
9:14 10:16,20 11:10
11:13 12:7 13:6
15:10,17 16:6

---
**8**
---

**80 (1)**
8:18
**82 (1)**
4:11
**82nd (3)**
5:21 9:4 19:23
**82nd-83rd (17)**
2:5 3:1,9,11,15,21 5:2
6:1,5,18 7:1 8:4,16
11:10 15:9 19:21
27:8
**82-83 (1)**
4:24
**8283 (1)**
2:19
**83 (1)**
4:12
**83rd (3)**
5:22 9:5 19:23

# EXHIBIT 2



REAL ESTATE MANAGEMENT AGREEMENT

FOR

COURT MARTINE ASSOCIATES

JANUARY 1, 2002

## TABLE OF CONTENTS

ARTICLE 1    APPOINTMENT AND AUTHORITY OF THE AGENT; DEFINED TERMS        3

ARTICLE 2    THE AGENT'S AGREEMENTS        4

ARTICLE 3    INSURANCE; INDEMNIFICATION        11

ARTICLE 4    MANAGEMENT FEES        12

ARTICLE 5    TERM/TERMINATION        14

ARTICLE 6    ARBITRATION        17

ARTICLE 7    MISCELLANEOUS    18

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of January, 2002, between **Court Martine Associates** (the "Owner"), having offices in care of Minskoff Grant Realty & Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 39-55 Court Street/167-183 Martine Avenue, White Plains, NY, County of Westchester, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.

## APPOINTMENT AND AUTHORITY
## OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

## ARTICLE 2.

### THE AGENT'S AGREEMENTS

2.1.    Provided the Owner makes available the funds required therefore, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.    To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property.  All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible.  Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent.  All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner.  Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.    At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

2.1.3. To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours. The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision. Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

2.1.4. To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge. The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

2.1.5. To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

2.1.6.  To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7.  Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in <u>Exhibit A</u> (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8.  At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention.  The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9.  To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10.    To notify the Owner promptly (together with copies of supporting documentation) of:   any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

2.1.11.    To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.    To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company agreement, mortgage and other similar agreements.  The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions.  All checks over $10,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1. hereof, except for checks in payment of budgeted and/or approved expenditures.

2.1.13.    To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.    Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1. hereof, and sole right in its discretion to approve or disapprove proposed tenants or lease transactions.  No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

interest of the partners/members of the Owner.

2.2.     The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt and processing of all of the monthly bank statements, in form reasonably satisfactory to the Owner. The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property. No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases. The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner. Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.     The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.  a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.  a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.  a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.  a monthly tenant arrears statement aging the balances as required;

2.3.5.  Quarterly rent roll and budget comparisons; and

2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

2.4. The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

2.5. Commencing with respect to the calendar year 2003, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property. Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense. With respect to calendar year 2002, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate. Until the Owner approves a new budget, the Agent shall operate the Property under the proposed budget, including non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

2.6. Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1(a)(iii) hereof.

2.7. The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise. In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property. Owner's members/partners may participate personally or by conference call.

## ARTICLE 3.

### INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith. The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith. The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives. Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion. To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

3.2.1. The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.    In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses. Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing. Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.    The provisions of this Article 3 shall survive the termination of this Agreement.

## ARTICLE 4.

## MANAGEMENT FEES

4.1.    For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.50% of the total income per year. The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1. On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefore (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

        4.1.2.  In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in <u>Exhibit B</u> in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 50% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 75% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

## ARTICLE 5.
## TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from January 1, 2002 through December 31, 2006. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of December 31, 2006 and thereafter as to each annual extension, as of October 1 of each year.

5.1.1.    Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty,  national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2.  Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3.  Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

other penalty.  The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.2.    Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2., the following to the Owner or the Owner's appointed agent:

5.2.1.  upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

5.2.2.  Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

5.2.3.  a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

5.2.4.  All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

5.2.5.  a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder.

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.  assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.  remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.  otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.
## ARBITRATION

6.1.    <u>Arbitration</u>.

6.1.1.  For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association. The arbitration panel shall consist of one arbiter. Within twenty (20) days after the above notice is given, the parties shall mutually agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in

commercial real estate.  If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

6.1.2.  The parties shall file with the arbiter, and exchange among counsel within ten  (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree).  No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

6.1.3.  The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment.  The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding.    Judgment  upon  the  arbitration  award  may  be  entered  in  any  court  having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less.  The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.

### MISCELLANEOUS

7.1.    Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of

the partners/members of the Owner.

7.2    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on <u>Exhibit A</u> attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested. Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner. For the purposes of this provision, "immediate family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.    No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.    All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.    The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.    No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.    The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof. No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof. The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.    This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.    This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.    The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.

COURT MARTINE ASSOCIATES

BY: _____
        Marjorie Minskoff Schleifer
        Partner MLPIII

BY: _____
        Patricia Minskoff
        Maggie P. Minskoff QTIP Trust

BY: _____
        Carolyn Minskoff
        Estate of Myron A. Minskoff

MINSKOFF GRANT REALTY &
MANAGEMENT CORP., AS
AGENT

BY: _____
        Jean Minskoff Grant, President

## EXHIBIT A

1.  Owner's Address:

    82nd - 83rd Street Venture
    c/o Minskoff Grant Realty and Management Corp.
    1350 Avenue of the Americas
    32nd Floor
    New York, NY 10019

    with copies to:

    Marjorie Minskoff Schleifer
    Partner MLPIII
    c/o Minskoff Grant Realty & Management Corp.
    1350 Avenue of the Americas/32nd Floor
    New York, NY 10019

    and

    Patricia Minskoff
    Maggie P. Minskoff QTIP Trust
    435 Lower County Road
    Harwich Port, MA 02646

    and

    Carolyn Minskoff
    Estate of Myron A. Minskoff
    1350 Avenue of the Americas/23rd Floor
    New York, NY 10019

2.  Agent's Address:

    Minskoff Grant Realty & Management Corp.
    1350 Avenue of the Americas
    32nd Floor
    New York, New York  10019

    Attention:  Jean Minskoff Grant

3. Name of Bank Account:

        Account No. 251-001665

4. Name of Bank:        JPMorganChase

5. Independent Auditors:      Altman & Dick
                           350 Broadway
                           New York, NY 10013

All designations in this <u>Exhibit A</u> may be changed at any time by the Owner.

EXHIBIT B

Leasing Commissions Schedule as per current published rates in the marketplace, to be updated accordingly.

First year or any fraction thereof ...........................6%

Second & Third year...........................................6%

Fourth year up to and including the tenth year ........3%

The eleventh year and beyond ............................2%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

      (a)  charges, if any, for electric and steam to be supplied to Tenant;

      (b)  any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

      (c)  any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

      (d)  any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

      (e)  rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist.  Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term.  If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid.  If the lease is not so canceled by the tenant or the right of cancellation

is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term.  A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

| Westchester | | Current |
|---|---|---|
| | 1 | 6% |
| | 2 | 6% |
| | 3 | 6% |
| | 4 | 3.00% |
| | 5 | 3.00% |
| | 6 | 3.00% |
| | 7 | 3.00% |
| | 8 | 3.00% |
| | 9 | 3.00% |
| | 10 | 3.00% |
| | 11+ | 2.00% |

# EXHIBIT 3

# MINSKOFF GRANT REALTY & MANAGEMENT CORP.

1350 AVENUE OF THE AMERICAS, NEW YORK NY 10019 • (212) 765-9700 FAX (212) 664-9002

May 24, 2004

Steven M. Pesner, Esq.
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
590 Madison Ave
New York, NY 10022

Re:    Letters of May 13, 2004

Dear Mr. Pesner:

I write in response to your letters dated May 13, 2004, requesting review of documents relating to various projects.

As I am sure the members of the Myron Minskoff family have reported, Minskoff Grant Realty and Management Corp. manages the eight (8) properties listed below.

1.    **WALDBAUMS – 63RD ROAD VENTURE**
2,    **9TH STREET ASSOCIATES**
3.    **59 SOUTH BROADWAY ASSOCIATES/POST-BROADWAY ASSOCIATES**
4.    **29 COURT STREET VENTURE**
5.    **82ND-83RD STREET VENTURE/COURT-MARTINE ASSOCIATES**
6.    **HALSTEAD-HARRISON ASSOCIATES**
7.    **77TH QUEENS ASSOCIATES**
8.    **8TH STREET ASSOCIATES**

As to the other properties referred to in your letters, please be advised as follows:

The property: **Madison – 74th Associates:**

This leasehold ended in 1997, there is very little assistance we can provide. This office never managed Madison - 74th. As a courtesy and for no remuneration, we held the remaining funds as legal counsel pursued a former tenant for arrears. The suit was successful and counsel distributed all funds remaining after legal expenses to the owners.

The property: **Queens Philadelphia:** Was sold and closed on September 14, 2001.

In regard to the properties for which we have current management, the respective property owners receive the following:

**Monthly Report:**        **(Set of March 2004 Reports Included)**

        Cash Sheet indicating:
                Cash Balance
                Money Market Funds
                Tenant Security Deposit
                CD Value @ Purchase
                Total Balance
                Bank for property
        Building Status Reports
        Cash Accounts Balances and Activity
        Bank Account Balance Report
        Deposit Register
        Check Register
        Aged Receivables Summary

**Quarterly Report (additional information)**        **(Set of March 2004 Reports Included)**

      Quarterly Rent Roll
      Balance sheet
      Budget comparison Year-to-Date
      Quarterly Income Statement and Cash flow

**Annual Budget Preparation**

The budgeting process begins in the fall of the next budget year, and is a very interactive process with all owners able to comment and participate. Please note that the members of the Myron Minskoff Family have never disapproved a final budget.

**Lease/renewal/amendment negotiations**

All lease prospects are presented on a 3-4-page summary report for owner's approval.

**Unbudgeted Property Expenditure**

Owners receive information on any unbudgeted expenditures over $10,000 for approval.

It is my recollection that I have never once had a single comment or question posed on any point contained in any of these reports by Sara Allan, the MYCA LLP representative,

Mr. Allan, or Carolyn Minskoff. Mr. Allan comments on budgets and insurance but nothing else with respect to any of these the properties.

We are of course happy to cooperate in any way we can. We operate a tight ship and everyone here works more than a full time job. Therefore, in order to comply with a request of this magnitude, we have no choice but to set some ground rules.

Ground Rules:

1. Our office will set the times at our mutual convenience.
2. If the respective owner of a property under review is not present we will require written authorization for their representative.
3. If we believe in our reasonable judgment that any document(s) are confidential and/or proprietary we will require a confidentiality agreement.
4. Any time our employees spend on this will need to be reimbursed by your client.
5. Items to be copied will be marked and we will send them out for duplication at your client's expense.
6. We will require a security guard shall be present at all times. The cost of the guard will be at your client's expense.
7. You may review the documents that are here at this office which are current back through January 2003. Older documents are all in storage so we will then require you to specify a property. The storage boxes relating to that property will have to be ordered in advance of a scheduled visit. The cost of delivering the boxes here and returning them to storage will also need to borne by your clients.
8. We require that there be an advance of $20,000 to cover the anticipated costs as described above. Should 80% of this amount be expended your clients shall supplement this amount with an additional $20,000 payment.

Please confirm that these ground rules meet with your client's approval and contact me so that we can arrange the first meeting.

**Minskoff Grant Realty**
**& Management Corp.**

Jean Minskoff Grant
President

JMG:djs
Enclosure

3

CC:    Robb Aley Allan
        Sara Minskoff Allan
        Sally Edwards
        Stacey Minskoff Essenfeld
        Estate of Lucille Feldesman
        Michael Lockhard
        Alan & Royanne Minskoff
        Alan Minskoff Trust
        Alan Minskoff
        Carolyn Minskoff
        Edward Minskoff
        Estate of Jerome Minskoff
        John Eric Minskoff
        A.R.M. Minskoff Family LP

Maggie Minskoff QTIP Trust
Marjorie Minskoff Schleifer
Minskoff LP III
Stewart Minskoff
James Sterling
James K. Wolosoff
Morty&Gloria Wolosoff Foundation
Van Warren Wolosoff
Wendy Wolosoff

*All above without enclosures*

4

## CERTIFICATE OF SERVICE

I, Michael D. Lockard, an attorney with the law firm of Akin Gump Strauss Hauer &

Feld, hereby certify that on this 17th day of April 2008, I caused to be served, via email delivery

a copy of (1) the Declaration Of Michael D. Lockard In Further Support Of Defendants' Joint

Motion To Dismiss The Complaint And In Opposition To Plaintiff's Motion For Summary

Judgment; (2) the Declaration Of Sara Minskoff Allan In Further Support Of Defendants' Joint

Motion To Dismiss The Complaint And In Opposition To Plaintiff's Cross-Motion For Summary

Judgment; (3) MYCA, LLC's Reply Memorandum Of Law In Further Support Of Defendants

Joint Motion To Dismiss The Complaint And In Opposition To Plaintiff's Cross-Motion For

Summary Judgment; and (4) MYCA, LLC's Response To Plaintiff's Local Rule 56.1 Statement

to:

WILLKIE FARR & GALLAGHER
Thomas H. Golden
787 Seventh Avenue
New York, New York 10019

*Counsel for plaintiff Scorpio 8283 LLC*

-and-

WHITEMAN OSTERMAN & HANNA LLP
Philip H. Gitlen
Christopher E. Buckey
One Commerce Plaza
Albany, New York 12260

*Counsel for defendant
2220 Equities Management Limited Partnership*

Dated: New York, New York
        April 17, 2008

_____
Michael D. Lockard